# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **ELITE ENTERPRISES, INC., and** | ) | |
| **CREATIVE LIQUID COATINGS, INC.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:08-CV-157** |
| | ) | |
| **LIBERTY STEEL PRODUCTS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

## I.  INTRODUCTION

Elite Enterprises, Inc. ("Elite"), and Creative Liquid Coatings, Inc. ("Creative"), are suing Liberty Steel Products, Inc. ("Liberty"), claiming that it breached its Supplier Agreement when it stopped using them to paint automobile bumpers supplied to Freightliner Trucks.[1] (Docket # 1.)  The parties have now filed cross-motions for summary judgment (Docket # 42, 49), and the issue essentially comes down to whether the Supplier Agreement entered into between Liberty and Elite is a requirements contract.  In addition, Liberty contends that Elite's subsequent assignment of the Agreement to Creative was invalid and asks that Creative be dismissed for lack of standing.

For the following reasons, both parties' motions for summary judgment will be DENIED.

---

[1] Diversity jurisdiction exists under 28 U.S.C. § 1332(a).  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The parties generally agree on most of the underlying facts surrounding the dispute. In fact, both sides maintain that the Supplier Agreement is clear and unambiguous. Each party, however, suggests a radically different interpretation of the Agreement.

Plaintiffs Elite and Creative are Indiana corporations headquartered in Fort Wayne, Indiana, and Defendant Liberty is an Ohio corporation based in North Jackson, Ohio. (Am. Compl. ¶¶ 1-3.) Prior to September 2004, Elite was the "Tier 1" supplier of finished truck bumpers to Freightliner, providing Freightliner with painted, finished, ready-to-assemble bumpers.[2] (Geist Aff. ¶ 2, Ex. A.) Liberty, however, was the actual bumper manufacturer. (Geist Aff. ¶ 7, Ex. A.) It supplied the bumpers to Elite for painting, and Elite then delivered the painted bumpers to Freightliner. (Geist Aff. ¶¶ 6, 7.)

In early 2004, Elite and Liberty began discussing a switch in the production chain. (Geist Aff. ¶ 8.) Under this new arrangement, Liberty, not Elite, would serve as the "Tier 1" supplier to Freightliner; Elite, however, would still paint the Freightliner bumpers that Liberty manufactured. (Geist Aff. ¶ 8.) According to Elite, the new arrangement made sense because Liberty's work was the more expensive step in the bumper-manufacturing process. (Geist Aff. ¶ 9.) "Because a Tier 1 supplier must front payment at times, the manufacturer of a more expensive component can at times better manage the Tier 1 status." (Geist Aff. ¶ 9.) Liberty does not challenge this assertion, but maintains that the switch was *primarily* made because Elite

---

[2] The Tier 1 supplier sits directly beneath the final manufacturer in the chain of production, and is able to subcontract out work to produce the finished product. (Geist Aff. ¶¶ 3-5.) "Tier 1 status in the manufacturing process is a coveted position for many reasons, including but not limited to the facts that the Tier 1 supplier is the first party paid for delivery of the finished goods and a Tier 1 supplier has a more secure position in the chain of commerce." (Geist Aff. ¶ 4.)

owed Liberty more than one million dollars for unfinished steel bumpers at the time, and Liberty agreed to reduce Elite's debt in exchange for its elevation to the preferred Tier 1 position. (Dubaj Dep. 42, 55-56, 66; Cline Dep. 74-75; Grasso Aff. ¶¶ 6-8.)

Accordingly, in June 2004, Elite and Liberty began negotiating the terms of a Supplier Agreement to effect the Tier 1 switch. (Dubaj Dep. 66.) The parties exchanged approximately six drafts of the proposed Supplier Agreement during this process. (Dubaj Dep. 50.) Once finalized, the Supplier Agreement took effect on September 7, 2004. (Geist Aff. Ex. A.)

The provisions of the Supplier Agreement relevant to this dispute are as follows:

## RECITALS

Upon direction from Freightliner, Liberty is proceeding to restructure the contractual relationships among the parties for Liberty to become a direct "Tier 1" supplier to Freightliner of the completed and painted steel bumpers and Elite is willing to relinquish its direct "Tier 1" status to Liberty in consideration of Liberty's agreement to purchase painting services for Freightliner steel bumpers from Elite, subject to Elite's continued performance of the Terms, Covenants, and Conditions of this Agreement[.]

## PURPOSE

It is the express purpose of this Agreement to meet the existing and future painted steel bumper product requirements of Freightliner and to facilitate a smooth transition from Elite's status as a direct "Tier 1" supplier, currently purchasing raw steel bumpers from Liberty and processing them for painting and shipment to Freightliner, to Liberty's status as the direct "Tier 1" supplier of painted steel bumpers to Freightliner by this Agreement with Elite for Elite to provide painting and shipping of Liberty's steel bumper products to meet Freightliner's requirements.

## TERMS, COVENANTS, AND CONDITIONS

. . . .

1. <u>Restructuring of Contractual Relations</u>. Elite hereby relinquishes to Liberty the right to be the "Tier 1" direct supplier to Freightliner of all of Freightliner's painted steel bumper requirements.

2. <u>Elite's Current Inventory</u>.  Liberty will purchase from Elite its entire good and sellable inventory (including overruns by Liberty) of bumper products at the agreed raw prices as listed on "SCHEDULE A".  The purchase price will be paid by credit against the current amount owing by Elite to Liberty.  Any balance remaining will be paid to Liberty no later than 45 days from the execution date of this Supplier Agreement.

. . . .

8. <u>Default</u>.  In the event Liberty chronically fails to timely pay Elite for its painting and shipping services hereunder, "chronically" defined as more than 5 times during a calendar year, Elite shall have the right to terminate this agreement in writing upon 30 days' notice to Liberty. In the event Elite fails in any material respect to perform its obligations hereunder including, but not limited to, service, delivery, quality control, and cost competitiveness on retaining and securing additional bumper programs, and such failure is not cured within 20 days after written notice is mailed from Liberty specifying in detail the failure of performance, Liberty may terminate this agreement in writing. Any termination of this Agreement for default must be in writing and sent by certified U.S. Mail.

9. <u>Term of Agreement</u>.  Unless terminated for default pursuant to Paragraph 8 of this Agreement, this Agreement shall continue in full force and effect for so long as Liberty is a "Tier 1" supplier of painted steel bumpers to Freightliner.

10. <u>Modification of Agreement</u>.  In the event that Freightliner's painted steel bumper requirements change beyond a commercially competitive price or quantity and remains so for at least three months, Liberty may notify Elite in writing of a desire to modify this Agreement, and the parties shall bargain in good faith to either reach new acceptable terms, or terminate this Agreement.

11. <u>Elite's Right of Assignment</u>.  Elite shall have the right to assign all of its right and obligations under this agreement to Creative Coatings, Inc. ("Creative") . . . and Liberty consents to such Assignment, subject to Paragraph 12 of this Agreement and provided that there is no release of liability of Elite under the Terms, Covenants, and Conditions of this Agreement. Further, consent to such assignment shall be conditioned upon Liberty's review and approval of Creative Coatings, Inc.'s financial statements. Upon written notice from Elite accompanied by the written undertaking of Creative Coatings, Inc. to accept the Assignment from Elite and to perform all of the obligations as painting services supplier strictly in accordance with the terms of this Agreement, and, additionally to accept all financial and other obligations owed to Liberty by Elite, Liberty shall thereafter accept performance by Creative Coatings, Inc. and remit payments directly to Creative Coatings, Inc. However, Elite shall remain obligated to

4

Liberty and Freightliner under the Terms, Covenants, and Conditions of this Agreement.

    12. <u>Liberty's Right to Inspect and Separately Agree to Elite's Assignment of this Agreement to Creative Coatings, Inc</u>.  Liberty [s]hall have the right to inspect the premises, facilities, and records of Creative Coatings, Inc., that pertain to its ability to perform the requirements of this Agreement, specifically to include but not limited to painting and shipping Liberty's steel bumpers to meet Freightliner's requirements, performing the handling and shipping of bumpers, having adequate warehousing space to inventory Liberty's Freightliner product requirements, assuming and paying all of Elite's financial obligations to Liberty, and managing the painted steel bumper program. Liberty shall have 30 days from the execution of this Agreement between Liberty and Elite OR Elite's assignment of this Agreement to Creative to complete this Inspection. If Liberty's Inspection results in Liberty's rejection of the Assignment, Creative shall have 30 days after receipt of Liberty's specific written objections to the Assignment to correct any discrepancies in order to fully perform this Agreement.

    13. <u>Miscellaneous</u>.  This Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes all prior written and oral agreements. This Agreement may not be modified or amended except in writing signed by both of the parties hereto. This Agreement shall be governed and construed in accordance with the laws of the State of Ohio. All amounts payable hereunder shall be payable with all costs of collection including attorney's fees.

(Geist Aff. Ex. A.)

Yet, apparently unbeknownst to Elite at the time, Liberty was soliciting bids from other painters while Liberty and Elite were negotiating the Supplier Agreement. (Dubaj Dep. 97-98, 118.)  As Liberty tells it, there "were concerns on both [Liberty's] end and Freightliner's end that Elite may not be in existence, so we had to develop a plan B." (Dubaj Dep. 97.)  Liberty further explains: "[T]he way Elite was operating, we were in fear that they could implode at any given time." (Dubaj. Dep. 118.)  "So we were behind the scenes all along trying to certify a backup source in case they imploded." (Dubaj Dep. 97.)

By June 2005, just nine months after it executed the Supplier Agreement, Liberty decided it was going to phase out any work to Elite in favor of a competing painting company. (Dubaj Dep. 97.) Elite and Creative learned of Liberty's decision to phase them out two months later, in November 2005. (Dubaj Dep. 95.) Accordingly, by early February 2007, Elite and Creative had painted their last Liberty bumpers. (Dubaj Dep. 87.)

Liberty, however, was not the only party under the Supplier Agreement to take action without the other's knowledge after the Agreement's effective date. In that respect, without any notice to Liberty, Elite purportedly assigned its rights and obligations under the Supplier Agreement to Creative on September 2, 2005, thereafter transitioning the work and invoicing to Creative.[3] (Geist Aff. ¶¶ 11, 12, Ex. B.) Though neither Elite nor Creative notified Liberty of the assignment, Creative sent thirty-two separate invoices to Liberty for paint work between October 3, 2006, and March 31, 2007, under Creative's name, and Liberty paid each of them in full.[4] (Dubaj Dep. 24-25, 61-71, 88-91; Grasso Aff. ¶¶ 10, 14.)

Elite and Creative are suing Liberty because they maintain that the Supplier Agreement is a requirements contract obligating Liberty to use them exclusively for all bumper painting work for as long as Liberty remains a Freightliner Tier 1 supplier. (Am. Compl. ¶ 12.) The thrust of their motion for summary judgment is that Liberty sent the Freightliner bumper work elsewhere without ever sending Elite or Creative a written notice of default or termination or

---

[3] Curiously, Creative and Elite also entered into a "Subcontract" on February 9, 2006, that is, *after* the purported September 2005 assignment, by which Elite subcontracted certain work to Creative, including the Freightliner work that it had purportedly assigned to Creative five months earlier. (*Compare* Def.'s Br. in Supp. Ex. I, *with* Ex. F.)

[4] Apparently, the thirty-two invoices that Liberty received from Creative had Creative's name and address label "taped . . . over" Elite's letterhead. (Dubaj Dep. 24.)

notifying them in writing of its desire to modify the Supplier Agreement, and thus breached its requirement obligations under the Supplier Agreement. (Pls.' Mem. of Law in Supp. of Pls.' Mot. for Summ. J. 2.; Am. Compl. ¶¶ 11, 12.)

In response, Liberty does not challenge the validity of the Supplier Agreement but instead argues that by its clear and unambiguous terms the Supplier Agreement is not a requirements contract. (Def.'s Resp. to Pls.' Mot. for Summ. J. 2, 4.) In its own motion for summary judgment, Liberty asks the Court to find that, as a matter of law, the Supplier Agreement is not a requirements contract, meaning that Liberty was not obligated to send any paint work to Elite. (Def.'s Br. in Supp. of Its Mot. for Summ. J. 1.) Liberty also alleges that Elite did not properly assign the contract to Creative and asks that Creative be dismissed for lack of standing. (Def.'s Br. in Supp. 1.)

### III.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 (7th Cir. 2008) (quoting *Payne*, 337 F.3d at 770). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

"When cross-motions for summary judgment are filed, courts "look to the burden of proof that each party would bear on an issue of trial; [courts] then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *M.O. v. Ind. Dept. of Educ.*, No. 2:07-CV-175-TS, 2009 WL 857548, at *3 (N.D. Ind. Mar. 31, 2009) (alteration in original) (citing *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)). "The contention of one party that there are no issues of material fact sufficient to prevent the entry of judgment in its favor does not bar that party from asserting that there are issues of material fact sufficient to prevent the entry of judgment as a matter of law against it." *Id.* (citation omitted); *see Zook v. Brown*, 748 F.2d 1161, 1166 (7th Cir. 1984). "It is true that cross-motions for summary judgment do not waive the right to a trial, but this rule does not alter the respective burdens on cross-motions for summary judgment–more particularly here, the responsive burden of a plaintiff who moves for summary judgment and is confronted with a cross-motion for summary judgment. The motions are treated separately." *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 (7th Cir. 2008) (citations omitted); *M.O.*, 2009 WL 857548, at *3.

## IV. DISCUSSION

The parties do not dispute the validity of the Supplier Agreement; rather, their arguments concern the interpretation of its terms. That is, the dispute centers on whether the terms of the

Supplier Agreement indicate that it is clearly and unambiguously a requirements contracts obligating Liberty to send all of its bumper painting work to Elite. Ultimately, because there are two reasonable interpretations of the Agreement even after considering the extrinsic evidence, this dispute must be settled by the trier of fact.

### A. Law Applicable to the Dispute[5]

"Where the language of a contract is clear and unambiguous, the interpretation of that contract is a question of law for the court." *Becker v. Rapidigm, Inc.*, No. 1:03CV875, 2005 WL 2397672, at *6 (S.D. Ohio Sept. 28, 2005) (citing *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio*, 474 N.E.2d 271, 272-73 (Ohio 1984)); John R. Kennel, *Contracts*, 18 OH. JUR. 3RD CONTRACTS § 118. "Conversely, where the terms of a contract are ambiguous and indefinite, determining the intent and meaning of the parties becomes a question of fact for the jury." *Becker*, 2005 WL 2397672, at *6 (citing *Amstutz v. Prudential Ins. Co.*, 26 N.E.2d 454, 456 (Ohio 1940); *GenCorp., Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 818 (6th Cir. 1999)); *Books a Million, Inc. v. H & N Enters., Inc.*, 140 F. Supp. 2d 846, 854 (S.D. Ohio 2001); Kennel, *supra*, at § 118.

"A contract is ambiguous if it is susceptible to more than one reasonable interpretation." *Becker*, 2005 WL 2397672, at *6 (citing *Am. Druggists' Ins. Co. v. Equifax, Inc.*, 505 F. Supp. 66 (S.D. Ohio 1980); *City of Hillsboro v. Fraternal Order of Police, Ohio Labor Council, Inc.*, 556 N.E.2d 1186 (Ohio 1990)). "In making the determination of whether language is ambiguous, courts must generally give words and phrases their plain, ordinary, natural or

---

[5] The contract provides, and the parties agree, that Ohio law governs their contractual dispute. Moreover, Indiana choice of law rules, which the Court is obligated to follow, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), also point to Ohio substantive law as the applicable authorities to be consulted.

commonly accepted meaning." *Id.* (citing *Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347 (Ohio 1982)).  "Generally, courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement." *Id.* (citing *Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499, 501 (1992)); *Am. Coal Sales Co. v. Nova Scotia Power, Inc.*, No. 2:06-cv-94, 2009 WL 467576, at *27 (S.D. Ohio Feb. 23, 2009).

"Ordinarily courts look only to the language in the contract, but when the court determines that the contractual language is ambiguous, extrinsic evidence relevant to the parties' intentions may be considered to resolve the ambiguity." *Am. Coal Sales Co.*, 2009 WL 467576, at *28; *Manor Care, Inc. v. First Specialty Ins. Corp.*, No. 3:03CV7186, 2006 WL 2010782, at *4 (N.D. Ohio July 17, 2006); *see Becker*, 2005 WL 2397672, at *6 ("Parol evidence is admissible only if the terms of the contract are ambiguous and then only to interpret, but not to contradict, the express language." (citing *Ohio Historical Soc'y v. Gen. Maint. & Eng'g Co.*, 583 N.E.2d 340, 344 (Ohio 1989))); *Orchard Group, Inc. v. Konica Med. Corp.*, 135 F.3d 421, 429-30 (6th Cir. 1998) (applying Ohio law).  "Courts should be careful to avoid using extrinsic evidence to create an ambiguity; the ambiguity must be obvious on the face of the written contract." *Am. Coal Sales Co.*, 2009 WL 467576, at *28 (emphasis omitted).

> *B.  There Are Two Reasonable Interpretations of the Supplier Agreement, and Ultimately, the Trier of Fact Must Select the Most Reasonable Interpretation*

Here, the parties each assert that the Supplier Agreement's terms are clear and unambiguous, yet each offers very different interpretations of the Agreement.  Elite asserts that the Supplier Agreement gave it the right to paint *all* of Freightliner's bumpers, while Liberty contends that the Agreement was not exclusive and thus that it was free to send as much or as little of the Freightliner bumper work to Elite as it chose.

1. <u>The Plain Language of the Agreement</u>

According to Liberty, the express language of the Supplier Agreement does not set any minimum amount of work that it is required to subcontract to Elite. It further emphasizes that no provision in the Agreement states that the relationship between Liberty and Elite is "exclusive" or that Liberty is prohibited from using subcontractors other than Elite. (Def.'s Br. in Supp. 3.) Thus, as Liberty sees it, the Supplier Agreement simply lacks any language sufficiently definite to show that it intended to assume a requirements obligation to Elite.

From Elite's perspective, however, three portions of the Agreement reflect that it is a requirements contract. The first two are in the Agreement's Recitals and Purpose sections. Specifically, the Recitals reflect that Elite gave up its role as a Tier 1 supplier to Freightliner "in consideration of Liberty's agreement to purchase painting services for Freightliner steel bumpers from Elite, subject to Elite's continued performance of the Terms, Covenants, and Conditions of this Agreement." Similarly, the express Purpose of the Agreement is "to meet the existing and future painted steel bumper product requirements of Freightliner" with "Elite to provide painting and shipping of Liberty's steel bumper products to meet Freightliner's requirements."

These two provisions pointed to by Elite, however, do not definitively reflect that the parties intended to create a requirements contract. Rather, the clauses simply describe the factual context surrounding the formation of the Supplier Agreement–that is, that the parties desired to keep Freightliner supplied with bumpers without interruption. While the language is certainly consistent with a requirements contract, it also is not inconsistent with Liberty's interpretation–that it would now be the party responsible for meeting Freightliner's requirements, through the use of Elite and other suppliers. *See generally Maverick Oil & Gas v.*

*Barberton City Sch. Dist.*, 872 N.E.2d 322, 613 (Ohio App. 2007) ("A contract term is ambiguous if it can be reasonably understood in more than one sense.") (citation and internal quotation marks omitted). Furthermore, though prefatory language in a contract is "frequently intended to, and often do[es], shed light on the circumstances the parties wished to have considered in the interpretation of the main body of the contract", there are no "substantive pronouncements by Ohio courts on the nature of recital clauses and their import." *Fox v. Fox*, No. 01AP-83, 2002 WL 722804, at *8 (Ohio App. Apr. 25, 2002) (unpublished). Therefore, this prefatory language does not definitively establish that the parties intended to create a requirements contract.

Next, Elite points to § 9 of the Agreement, which addresses the Agreement's term. It states that the Agreement is to "continue in full force and effect for so long as Liberty is a 'Tier 1' supplier of painted steel bumpers to Freightliner." As Elite sees it, because Liberty is still the Tier 1 supplier of bumpers to Freightliner, this sentence in the Agreement "entitl[es] Elite and Creative to an ongoing right to paint." (Pls.' Resp. Br. 10.) Again, while this provision is consistent with a requirements contract, it is also consistent with Liberty's proposed interpretation–that it could use Elite as much or as little as necessary in conjunction with other suppliers to fulfill Freightliner's requirements.

Thus, the language pointed to by Elite "standing alone," falls short of establishing the existence of a requirements contract. *Zemco Manuf., Inc. v. Navistar Int'l Transp. Corp.*, 186 F.3d 815, 817 (7th Cir. 1999). Nevertheless, we also "cannot say that it establishes, as a matter of law, that the contract is not such a contract." *Id.* Rather, the language is susceptible to at least two interpretations. *Id.* "A document is ambiguous if the court concludes as a matter of law that

the parties propose two or more reasonable interpretations." *Wagner v. Blue Cross & Blue Shield of N. Ohio, Inc*., Nos. 52972, 52974, 1987 WL 20446, at *3 (Ohio App. Nov. 25, 1987); *see also Pharmacia Hepar, Inc. v. Franklin*, 676 N.E.2d 587, 592 (Ohio App. 1996); *Amdee, Inc. v. Jacobson*, No. 52800, 1987 WL 17914, at *4 (Ohio App. Oct. 1, 1987) ("In deciding whether more than one reasonable interpretation renders the language ambiguous, the court rules whether each proposed interpretation is reasonable.").

In the event of ambiguity, "evidence about the parties' expressions or actions may explain otherwise ambiguous language." *Amdee*, 1987 WL 17914, at *4 (citing *Hosford v. Automatic Control Sys., Inc*., 14 Ohio App. 118, 119 (1984)). That is, when "the contract, taken as a whole, is amibiguous[,] . . . further investigation as to whether the parties intended a requirements contract is required. Resort to extrinsic evidence is appropriate in such a situation." *Zemco*, 186 F.3d at 818. Therefore, the Court will next examine the extrinsic evidence offered by the parties in an effort to resolve the Agreement's ambiguity concerning quantity.

2. The Extrinsic Evidence

With respect to extrinsic evidence, Elite asserts that its intent can be discerned "by the very existence of the Supplier Agreement" in that if there was no "ongoing expectation of performance" by Elite, the "entire document is unnecessary." (Pls.' Resp. Br. 10.) Elite further argues that its intent is demonstrated by its relinquishment of its Tier 1 status in that the Tier 1 status "is valuable and not given up lightly." (Pls.' Resp. Br. 11.)

Elite's assertion certainly has some merit with respect to its assertion that the parties intended a requirements contract, considering that it is undisputed that a Tier 1 manufacturing

status is a valuable commodity. Nonetheless, Elite seems to be selectively recalling the circumstances surrounding the formation of the Agreement. It is undisputed that at the time the parties entered into the Agreement, Elite owed Liberty over one million dollars and the Agreement provided for Liberty's purchase of Elite's outstanding inventory. Thus, it is not unreasonable to infer from these circumstances that Elite may have been concerned that it could not meet its Tier 1 obligations to Freightliner or that it could face a collection action from Liberty, and that it agreed to enter into a non-exclusive Agreement so that it could work out its sizable debt and minimize any potential adverse consequences from Liberty or Freightliner.[6]

---

[6] Specifically, Dubaj of Liberty testified:

Q    In giving up the Tier I status, they are giving up a valuable thing; am I right? Tier 1 status is a valuable – it's a leverage, isn't it?

A    Well, . . . I guess Liberty should have probably just forced [Elite's] hand and, . . . put them under by calling our marker, but we didn't do that . . . .

Q    But you are not really answering my question. Tier I status in the manufacturing process is a coveted position, is it not?

A    It's a double-edged sword.

Q    But, I mean, it's coveted in the sense that people actually bid to become a Tier I supplier; am I right?

A    Yes.

Q    If it wasn't coveted, Liberty Steel wouldn't have been willing to step in the position; am I right?

A    No; Liberty was interested in getting the million dollars that [Elite] owed us; that was it.

. . . .

Q    Are you saying the million dollars owed to you was the only reason you agreed to step into the Tier I status?

A    That was the primary motivation for us to take over Tier I. That was the simplest way for us to recoup our money.

. . . .

Q    Was that the only reason?

A    That is the only reason that I am aware of.

14

(*See, e.g.*, Dubaj Dep. 114 ("Freightliner was scared to death that Elite was going to implode and they couldn't supply the quality that they were looking for . . . ."), 118 ("The way Elite was operating, we were in fear that they could implode at any given time.").)  Therefore, Elite's proffer of extrinsic evidence does not definitively depict whether the parties intended to enter into a requirements contract or a non-exclusive agreement.

Liberty offers the prior course of dealing between the parties as extrinsic evidence in support of its interpretation. *See generally Air-Ride, Inc. v. DHL Express (USA), Inc*., No. 2008-04-012, 2009 WL 57617, at *6 (Ohio App. Jan. 12, 2009) (stating that the parties' prior course of dealing may guide the court in supplying an omitted term in a contract).  Liberty emphasizes that when Elite served as the Tier 1 supplier, it operated on a purchase order basis and not under an exclusive requirements contract. (Def.'s Reply. Br. 10; Grasso Aff. ¶¶ 4, 9 ("Liberty has a company policy not to enter into exclusive supplier agreements.").)  While certainly this evidence lends some support to Liberty's argument that the parties intended to enter into a non-exclusive arrangement, rather than a requirements contract, it is not overly persuasive, as there is no prior course of dealing with respect to the sale of a Tier 1 status between the parties and the switching of roles.  Therefore, this extrinsic evidence also does not necessarily clarify the quantity ambiguity in the Agreement.

In addition, Liberty proffers as extrinsic evidence an exclusivity and requirements provision from Elite's first proposed draft of the Supplier Agreement, which was removed during the parties' negotiation process:

---

(Dubaj Dep. 55-56; *see also* Grasso Aff. ¶¶ 6-8 ("The Supplier Agreement was a way for Liberty to guarantee that it would get paid by Elite.  Mr. Randall R. Geist personally guaranteed Elite's payments due to Liberty.").)

> 8. <u>Exclusivity and Requirements Contract</u>.  This Agreement and the obligations of the parties shall be construed as an exclusive dealing and requirements contract pursuant to which Liberty has agreed to purchase all of its painting services to meet Freightliner's painted bumper products requirements as determined by the "Freightliner 862 Ship Schedules" from Elite for the term of this agreement.  If Elite fails to abide by all terms of this Agreement, Liberty may purchase painting services from a competitor.

(Def.'s Br. in Supp. of Its Mot. for Summ. J. Ex. D.)  "Preliminary negotiations may be considered for the purpose of explaining ambiguous language in a written contract." *Pharmacia Hepar, Inc. v. Franklin*, 676 N.E.2d 587, 475 (Ohio App. 1996); *see also Olmstead Manor Skilled Nursing Ctr., Ltd. v. Olmstead Manor, Ltd.*, No. 80962, 2002 WL 31269815, at *3 (Ohio App. Oct. 10, 2002) ("Regardless of whether the agreement is completely or partially integrated, parol evidence can be used to establish the meaning of the written terms, but a judge must find an ambiguity in the written terms . . . before allowing parol evidence in aid of interpretation."); CJS Contracts § 336 ("[W]here there is doubt as to the meaning of a contract, all the negotiations between the parties should be considered in construing the agreement.").

As Liberty tells it, the removal of this exclusivity provision was a deliberate result of the negotiation between the parties, in that Elite ultimately gave up its hope for an exclusive arrangement and agreed to a non-exclusive arrangement.[7] (Def.'s Br. in Supp. 4.)  Elite suggests

---

[7] Specifically, Dubaj testified:

Q    Do you know how it is that the exclusivity provision that was Section 8 in these three separate drafts was eliminated from the supplier agreement?

A    Yea; Liberty objected to it.

Q    Okay.  Do you know who made the decision to object?

A    I think it was a collaborative effort between myself, Jim Grasso and Al Fleming.

Q    Do you know what the reason was?

A    We don't have an exclusivity agreement with anyone.

that the provision was removed *not* because it compromised on its position for exclusivity, but simply "because it felt the remaining language sufficiently entitled it to all of the Freightliner bumper work." (Pls.' Reply Br. 3.)  On this point, Elite's explanation seems a bit tenuous given that the parties ultimately are involved in litigation on that exact point.  In fact, Liberty's removal of the express exclusivity and requirements provision during negotiation of the Agreement, including the fact that the draft agreement was entitled "Exclusive Supplier Agreement" while the final version bore the title of "Supplier Agreement", should have set off a red flare to Elite if its intent was to enter into an exclusive, requirements contract.  Nonetheless, the language in the Recitals and Purpose that Elite points to, as well as the term of the Agreement, does give Elite's explanation some bite.

3. <u>The Agreement Must Be Submitted to the Trier of Fact</u>

In any event, "if the interpretation of the contract requires consideration of evidence extrinsic to the contract, then the courts generally submit such issues to the trier of fact." Kennel, *supra*, at § 118.  Here the extrinsic evidence when taken as a whole, to the extent that it is developed in the record, does not definitively explain the quantity ambiguity in the Agreement and still leaves the Court with two reasonable interpretations of the Agreement. *See Amdee*, 1987 WL 17914, at *4.  "In that event, the court does not choose the most reasonable interpretation as a matter of law.  Rather, the trier of fact selects the most reasonable interpretation in the light of evidence outside the document to support differing interpretations." *Id*.; *Wagner*, 1987 WL

---

Q        And why not? . . . .

A        Business clients changed all the time, and there was a real uncertainty if Elite would even be around in six
         months.

(Dubaj. Dep. 72.)

20446, at *3 (articulating that where the court cannot construe an ambiguous contract as a matter of law, "the trier of fact resolves such ambiguities"). That is, "[t]he trier of fact selects the interpretation which the parties manifested as their intention by their conduct or communications."[8] *Wagner*, 1987 WL 20446, at *3; *Amdee*, 1987 WL 17914, at *4.

Consequently, on this record, both parties' summary judgment motions must be DENIED and the dispute submitted to a jury.

### C. *Liberty Waived Any Right to Challenge Elite's Assignment of the Agreement to Creative*

Liberty also alleges that Elite did not properly assign the Supplier Agreement to Creative and asks that Creative be dismissed from this action for lack of standing. Because Liberty waived its right to challenge the assignment, its argument is unsuccessful in securing summary judgment against Creative.

Under Ohio law, contractual rights may be assigned unless "there is clear contractual language prohibiting assignment . . . ." *Pilkington N. Am., Inc. v. Traveler's Cas. & Sur. Co.*, 861 N.E.2d 121, 128 (Ohio 2006). Even absent such language, however, assignments are not valid if they materially alter the risks incurred by the non-assigning party. *Id.* Here, the language of the Supplier Agreement specifically provides for Elite's assignment of its rights under the document to Creative. Elite's assignment, however, was conditioned upon Liberty's review and approval

---

[8] In response to Plaintiffs' motion for summary judgment, Liberty asserts that Plaintiffs cannot establish a *prima facie* case of breach of contract because they failed to produce evidence of actual damages. (Def.'s Resp. Br. 12-13.) Plaintiffs, however, remind Liberty in their reply that their summary judgment motion was "limited only to the issue of breach and leaves to be litigated the question of damages", correctly emphasizing that Federal Rule of Civil Procedure 56 allows partial rulings, leaving other issues unresolved. (Pls.' Reply 5-6; Pls.' Mot for Summ. J. 1.) And, in its own motion for summary judgment, Liberty raises this argument for the first time in its reply brief. Of course, arguments raised for the first time in a reply brief to a summary judgment motion are deemed waived. *Baker v. Am's Mortgage Servicing, Inc.*, 58 F.3d 321, 325 (7th Cir. 1995). Therefore, Liberty's argument concerning proof of actual damages merits no further attention at this juncture and does not serve as a basis for entering summary judgment in Liberty's favor.

of Creative's financial statements; its right to inspect Creative's premises, facilities, and records; and Creative's written agreement to accept all of Elite's obligations under the Agreement.

Elite purportedly assigned the Supplier Agreement to Creative on September 2, 2005, via a written assignment document that was signed only by Elite and Creative. (Def.'s Br. in Supp. Ex. I.)  Liberty contends that it did not receive notice of the assignment until early 2009, after the initiation of this lawsuit. (Grasso Aff. ¶¶ 10, 12.)  In that regard, it is undisputed that neither Creative nor Elite produced Creative's financial statements for Liberty's inspection and that Liberty did not inspect Creative's premises or records. (Geist Aff. ¶ 13; Geist Dep. 185; Creative Adm. No. 9; Elite Adm. No. 9.)  As Liberty sees it, no valid assignment occurred from Elite to Creative because Elite failed to satisfy the conditions precedent in the Agreement, and thus in the absence of privity of contract, Creative lacks standing to advance any claims against Liberty. *See, e.g.*, *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 980 (7th Cir. 1996).

Elite does not dispute the fact that it failed to satisfy all the conditions precedent to assignment in the Agreement, but contends that Liberty waived its right to contest the assignment and thus is estopped from asserting the absence of such conditions.  Elite explains that between October 3, 2006, and March 31, 2007, that is, after the purported assignment, Creative sent thirty-two separate invoices under its own name to Liberty for paint work performed on Freightliner bumpers, and Liberty paid each and every invoice. (Dubaj Dep. 24-25, 61-71, 88-91.)

It is well settled under Ohio law that "a party, by words or conduct, may waive the terms of a written contract." *Automated Solutions Corp. v. Paragon Data Sys., Inc*., 856 N.E.2d 1008, 1016 (Ohio App. 2006); *St. Marys v. Auglaize Cty. Bd. of Comm'rs*, No. 2-05-17, 2006 WL

903586, at *8 (Ohio App. Apr. 10, 2006) ("[I]t is a basic principle of contract law that a party to a contract who would benefit from a condition precedent to its performance may waive that condition.") (alteration in original). "'Waiver' as applied to contracts, is a voluntary relinquishment of known rights." *Automated Solutions*, 856 N.E.2d at 1016 (citation omitted); *Griffith v. Linton*, 721 N.E.2d 146, 149 (Ohio App. 1998). "[T]he waiver may arise expressly or by implication, and the key to its application in a particular case is a showing of some performance pursuant to the terms of the contract." *Corey v. Big Run Indus. Park, LLC*, No. 09AP-176, 2009 WL 3090408, at *5 (Ohio App. Sept. 29, 2009); *St. Marys*, 2006 WL 903586, at *8 ("A condition precedent may be waived by the conduct and performance of the party asserting the condition."); *Cornett v. Fryman*, No. CA91-04-031, 1992 WL 12611, at *2 (Ohio App. Jan. 27, 1992) ("[A]n election to waive a condition precedent may be manifested by conduct."); *Pekarek v. Broadway Realty P'ship*, No. 58626, 1991 WL 95073, at *3 (Ohio App. May 30, 1991) ("A party may waive a written contract term by affirmative actions to that end.").

In that same vein, when a party fails to enforce its rights under a contract, such conduct can amount to an estoppel on the party. *Automated Solutions*, 856 N.E.2d at 1016. "The subsequent acts of parties may also modify the terms of a contract between them." *Id*. That is, "[a] continued, different, 'course of performance' between parties manifests a modification of the original agreement." *Id*. (citation omitted). Ultimately, "[i]t makes no difference what name is applied to that theory whether it be waiver, estoppel, novation or what have you; the theory simply is that the parties showed that they did not intend a particular provision of the contract to be strictly observed." *Id*.

Here, as Plaintiffs argue, the conditions precedent to Creative's assignment were indeed waived when Liberty entered into a course of performance with Creative that lasted six months and resulted in thirty-two paid invoices. Liberty's course of performance in this regard simply trumps any arguments to the contrary. Moreover, it is undisputed that Joe Dubaj, General Manager of Liberty's stamping operations and Liberty's signatory on the Supplier Agreement, called Todd Cline of Elite in October 2006 and acknowledged that Liberty had received notice of Creative's invoices and inquired about the change. (Dubaj Dep. 7, 13-14, 139.) According to Dubaj, Liberty did not object to the Creative invoices because it already had an alternative painter in mind for the bumpers. (Dubaj Dep. 85-86.)

More specifically, Dubaj testified:

Q    Okay. You have acknowledged that Liberty Steel received invoices for Freightliner bumpers from Creative Liquid Coatings, Inc.; correct?

A    Yes.

Q    And you have acknowledged that Liberty Steel provided payment in response to those invoices from Creative Liquid Coatings, Inc.; correct?

A    That is correct.

Q    Did you see those invoices when they came into - -

A    I saw the very first one.

Q    Okay. Did you receive all the [Creative] invoices?

A    No. Our bumper . . . program manager . . . sent it over, but I remember him coming down with the invoice and saying, hey, do you know anything about this. And, like I say, it was an Elite invoice with an address label with the words Creative Coatings with the same address . . . taped over top of it.

Q    What did you do?

| | |
|---|---|
| A | I looked at it and I spoke with Jim Grasso, [Liberty's Vice President of Finance and Aministration] about it, and we didn't put much credence into it because we already had an out date, when the final M2 product was going to move out of Elite.  Again, we had an oral agreement with Randy Geist as far as an exo-strategy [sic] . . . so we didn't think twice about it.  As far as we knew, the parts were still going to the same location, being painted at the same facility, same method of paint that they had been. |
| Q | So at that point you didn't care? |
| A | We knew we were out of there.  The only thing they were doing at that point was custom colors.  It wasn't a lot that, you know - - if they were imploding, it wasn't going to affect us. |

(Dubaj Dep. 84-86; *see also* Grasso Aff. ¶ 1.)  Though Liberty cites another portion of Dubaj's testimony indicating that he believed that Elite had merely changed its name to Creative (Dubaj Dep. 139-40), this evidence simply cannot overshadow the fact that Liberty consciously chose to ignore the transition between Elite and Creative because its plan for an alternative supplier was already in motion.  Moreover, since Dubaj was the signatory on the Supplier Agreement and testified that he had read and helped edit each of the six drafts of the Agreement and understood its terms (Dubaj Dep. 14, 50), he was certainly aware of the two provisions in the Agreement providing for Elite's assignment of the Agreement to Creative.[9]

Consequently, there is only one reasonable conclusion on this record–that Liberty waived its right to object to Elite's assignment of the Supplier Agreement to Creative.  Therefore, Liberty's assertion that summary judgment is warranted in its favor against Creative based on an invalid assignment and lack of standing is unsuccessful.

---

[9] Furthermore, Liberty's assertion that the assignment is invalid because it materially altered Liberty's risks by allowing Elite to "duck out" of the Supplier Agreement is unpersuasive. (Def.'s Br. in Supp. 12.)  The assignment provision in the Agreement expressly stated that in the event of its assignment to Creative, Elite remained obligated to Liberty under the terms of the Agreement.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' and Defendant's motions for summary judgment (Docket # 42, 49) are each DENIED. This matter is set for a telephonic scheduling conference for November 24, 2009, at 11:00 a.m. The Court will initiate the call.

SO ORDERED.

Enter for the 12th day of November, 2009.

S/Roger B. Cosbey_____
Roger B. Cosbey,
United States Magistrate Judge